## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**DENISE AMOROSO, ET AL.**                    **CIVIL ACTION NO.**

**VERSUS**                                              **18-1106-EWD**

**STATE FARM MUTUAL**                          **(CONSENT)**
**AUTOMOBILE INSURANCE**
**COMPANY, ET AL.**

## RULING AND ORDER

Before the Court[1] is a Motion for Summary Judgment (the "Motion"),[2] filed by Defendants State Farm Mutual Automobile Insurance Company ("SFM") and State Farm Fire and Casualty Insurance Company ("SFF") (collectively, "Defendants"). The Motion is opposed[3] by Plaintiffs, Denise Amoroso, Michal Ann Amoroso Traina, Elaine Amoroso Swart, and Anthony Amoroso, V.[4] Also before the Court is the Plaintiffs' Cross Motion for Partial Summary Judgment,[5] ("Cross-Motion"), which is opposed by Defendants.[6] Oral argument is not necessary. After reviewing the evidence and considering the arguments of the parties, the Motion will be granted, and the Cross-Motion will be denied. All Plaintiffs claims in this matter against SFM and SFF will be dismissed with prejudice. Judgment will be entered accordingly.

---

[1] On February 19, 2019, the parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). R. Doc. 5. That same day, the assigned district judge entered an Order of Reference, which referred this matter to the undersigned to conduct all further proceedings and to enter judgment in accordance with 28 U.S.C. § 636(c). R. Doc. 6.

[2] R. Doc. 13.

[3] R. Doc. 18.

[4] As two of the Plaintiffs and other family members who have been deposed share the last name "Amoroso," these individuals are referred to by their first names, *i.e.*, "Denise," "Anthony," and "Patsy." Decedent's other children, *i.e.*, Michal Ann Amoroso Traina ("Traina") and Elaine Swart ("Swart"), his insurance agent, Clay Stewart ("Stewart"), and his sisters, JoAnn Alford, Vickie Keith, Mary Pat Thevenot, and Lori Planchard, will be referred to by their last names. Furthermore, citations to the deposition testimony of these witnesses will be to the record document number (R. Doc.) and page number where the respective transcripts are filed in the record, not to the page numbers assigned by the deposition transcripts.

[5] R. Doc. 17.

[6] R. Doc. 21.

## I.    Background

This litigation arises out of the tragic death of former Baton Rouge Metro Councilman Anthony J. "Buddy" Amoroso, IV ("Decedent") on June 30, 2018.[7]  Decedent, who was riding his bicycle on a highway in West Feliciana Parish when he was struck from the rear by the automobile driven by Nicholas J. Alexander ("Alexander"), died at the scene ("the Accident").[8]  Plaintiffs are family members of Decedent: his wife, Denise, and three adult children, Michal, Elaine, and Anthony, all of whom claim entitlement to wrongful death damages and recovery of "the maximum UIM [underinsured motorist insurance] coverage available under one or more of the State Farm Mutual policies issued."[9]

At the time of the Accident, Alexander was insured by a policy of automobile liability insurance issued by SFM with a policy limit of $25,000 per person and $50,000 per accident (the "Alexander Policy"), and according to Plaintiffs, Alexander attested that he had no other available coverage beyond those limits.[10]  SFM tendered the $25,000 policy limits on the Alexander Policy to Plaintiffs, in exchange for Plaintiffs' release of SFM on the Alexander Policy and a conditional release of Alexander, subject to Plaintiffs' reservation of rights to any other available liability coverage.[11]

On December 5, 2018, Plaintiffs filed their Petition for Damages ("Petition") in the Nineteenth Judicial District Court for the Parish of East Baton Rouge, alleging that Defendants

---

[7] R. Doc. 1-3, ¶ 3 (Petition for Damages); R. Doc. 17-2, p. 2; R. Doc. 17-15 (Death Certificate).
[8] R. Doc. 1-3, ¶ 3; R. Doc. 17-15.
[9] R. Doc. 1-3, ¶¶ 4, 7, 9-10; R. Doc. 13-13, p. 12  (Denise's deposition testimony). According to Stewart, Decedent's State Farm Agent, UM coverage is "designed to provide benefit to our customer if they are hit by somebody who either has no insurance or not enough insurance, and basically it would offer benefit for things that they could have sued the offending party, the party that was responsible for the accident.  If they could have sued for a death benefit, it would pay as a death benefit…."  R. Doc. 13-12, p. 49.
[10] R. Doc. 1-3, ¶ 6.
[11] R. Doc. 1-3, ¶ 12.

breached their duties in failing to make appropriate unconditional tenders to Plaintiffs under the insurance policies, and that, in failing to do so, Defendants are in violation of their statutory obligations to Plaintiffs under Louisiana state law, including La. R.S. § 22:1892 and La. R.S. § 22:1973.[12]   In connection with these claims, Plaintiffs sought general and special damages, penalties, attorney's fees, costs and interest.[13] Plaintiffs contend that Defendants issued other applicable policies of insurance, including a personal automobile liability policy issued to Decedent (the "Personal Auto Policy"); a personal liability umbrella insurance policy ("PLUP") issued to Decedent and Denise; and a policy covering the 2014 Infiniti QX6 ("Infiniti") automobile driven by Decedent, but owned by Decedent's employer ("Infiniti Policy"), which allegedly provided uninsured/underinsured ("UM") motor vehicle coverage for the Accident.[14]  While SFM extended an unconditional tender of UM benefits in the amount of $100,000 to Plaintiffs on August 15, 2018,[15]  the Petition asserts that Defendants have failed to extend any UM benefits under either the second or third policies,[16] despite Plaintiffs' demand for the policy limits and submission of proof of loss,[17] and that Defendants have refused "to enter into an agreement whereby [Plaintiffs] would be allowed to reserve their right to pursue coverage on the business auto policy [*i.e.*, the Infiniti Policy] while allowing [Plaintiffs] to negotiate the $100,000.00 unconditional tendered check…."[18]

---

[12] R. Doc. 1-3, ¶¶ 18-20.

[13] R. Doc. 1-3, ¶¶ 18-20.

[14] R. Doc. 1-3, ¶¶ 7-8, and 14.  The parties have subsequently identified a fourth policy, the Commercial Liability Umbrella Policy ("CLUP"), issued to Decedent's mother Patricia Amoroso ("Patsy"), the Amoroso Family Partnership, and Prime Properties, LLC.  R. Doc. 13-11.

[15] R. Doc. 1-3, ¶ 13, *and see* Defendants' Answer at R. Doc. 3, ¶ 13 (admitting $100,000 unconditional tender).

[16] It is not entirely clear from the Petition how many SFM/SFF policies are at issue and the nature of each; however, the Motion and Cross Motion provide clarification on these issues.

[17] R. Doc. 1-3, ¶¶ 14-17.

[18] R. Doc. 1-3, ¶ 14.

On December 28, 2018, Defendants removed the matter to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.[19]  The Notice of Removal and Petition establish that there is complete diversity among the parties and that the amount in controversy is met.[20]  On January 8, 2019, Defendants filed their Answer, generally denying breach of the duties and obligations asserted by Plaintiffs, and affirmatively denying that "any underinsured motorist coverage under any insurance policies issued by Defendants applies to Plaintiffs' claims, other than the coverage from which the unconditional tender, referenced in paragraph 13 of the Plaintiffs' Petition for Damages, was made."[21]

On May 9, 2019, the Court granted Plaintiffs' Motion for Voluntary Partial Dismissal, and dismissed, with prejudice, Plaintiffs' claims for extracontractual damages, penalties, and/or attorney's fees, including but not limited to, all claims under La. R.S. §§ 22:1892 and 22:1973.[22] Defendants then filed the parties' Stipulation and Release ("Stipulation"), in which  Defendants agreed to permit Plaintiffs to negotiate the $100,000 tender and reserve their rights to seek additional UM coverage for the Accident under any other potentially applicable SFM/SFF insurance policy, in light of Plaintiffs' voluntary partial dismissal of other claims; Plaintiffs' agreement that they cannot recover UM coverage for the Accident in excess of the maximum per person coverage under any applicable policy or receive duplicative damages; and Plaintiffs' agreement that Defendants are entitled to a $100,000 credit if Plaintiffs ultimately recover

---

[19] R. Doc. 1, ¶ 5.
[20] *See* R. Doc. 1, ¶ 1 (alleging that all Plaintiffs are Louisiana citizens), ¶ 2 (alleging that both SFM and SFF are incorporated and have their principal places of business in Illinois), and ¶ 4 (alleging that Plaintiffs seek wrongful death damages, UM insurance benefits under several different insurance policies, and statutory penalties and attorney's fees, for which the amount in controversy exceeds $75,000). *See also* R. Doc. 1-3, ¶¶ 16, 18-20 (alleging Plaintiffs' demand for the PLUP policy limits of one million dollars and Plaintiffs' claim that Defendants breached their obligations to Plaintiffs in failing to remit same).
[21] R. Doc. 3, pp. 4- 5.
[22] R. Docs. 10-11.

additional benefits.[23]  As a result of the Stipulation, the only claims remaining are Plaintiffs' claims

for UM coverage under the four insurance policies issued by Defendants, which are the subject of

the pending Motions.

## II.    Law and Analysis

### A.   Legal Standards

#### 1.  Summary Judgment

Pursuant to well-established legal principles, summary judgment is appropriate where there

is no genuine disputed issue as to any material fact, such that the moving party is entitled to

judgment as a matter of law.[24]  In ruling on cross motions for summary judgment, the Court must

determine whether either party has established entitlement to judgment as a matter of law.[25]  A

party moving for summary judgment must explain the basis for the motion and identify those

portions of the pleadings, depositions, answers to interrogatories and admissions on file, together

with affidavits, if any, that show that there is no genuine issue of material fact.[26]  If the moving

party carries its burden of proof, the opposing party must direct the court's attention to specific

evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury

that it is entitled to a verdict in its favor, *i.e.*, "'there is no issue for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party.'"[27]  This burden

is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and

unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[28]  Rather,

---

[23] R. Doc. 12.

[24] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

[25] *Duncan v. U.S.A.A. Ins. Co.,* 2006-363 (La. 11/29/06), 950 So.2d 544, 547.

[26] *Celotex Corp.*, 477 U.S. at 322.

[27] *Anderson*, 477 U.S. at 249, *citing First National Bank of Arizona v. Cities Service Co. No. 23*, 391 U.S. 253, 288-89 (1968).

[28] *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

Fed. R. Civ. P. 56 mandates that summary judgment be entered against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case and on

which that party will bear the burden of proof at trial.[29]  Summary judgment is appropriate in any

case where the evidence is so weak or tenuous on essential facts that the evidence could not support

a judgment in favor of the non-moving party.[30]  In resolving a motion for summary judgment, the

court must review the facts and inferences in the light most favorable to the non-moving party, and

the court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual

disputes.[31]  "The issue of whether an insurance policy, as a matter of law, provides or precludes

coverage is a dispute that can be resolved properly within the framework of a motion for summary

judgment."[32]

### 2.  Louisiana UM Laws

As a federal court sitting in diversity, this Court must apply the law of the forum state in

the resolution of the instant insurance dispute pursuant to the *Erie* doctrine.[33]  In Louisiana, UM

coverage is provided for by La. R.S. § 22:1295:[34]

> (1)(a)(i) No automobile liability insurance covering liability arising
> out of the ownership, maintenance, or use of any motor vehicle shall
> be delivered or issued for delivery in this state with respect to any
> motor vehicle designed for use on public highways and required to
> be registered in this state or as provided in this Section unless
> coverage is provided therein or supplemental thereto, in not less than
> the limits of bodily injury liability provided by the policy, under

---

[29] *Celotex Corp.*, 477 U.S. at 323.

[30] *Little*, 37 F.3d at 1075.

[31] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

[32] *Pioneer Exploration, L.L.C. v. Steadfast Ins. Co.,* 767 F.3d 503, 513 (5th Cir. 2014), *citing Parekh v. Mittadar,* 2011–1201 (La. App. 1 Cir. 6/20/12), 97 So.3d 433, 437.

[33] *Erie R. R. Co. v. Thompkins,* 304 U.S. 64 (1938).  If a conflict of law was identified, Louisiana's conflicts law would also apply.  *See American Elec. Power Co. Inc. v. Affiliated FM Ins. Co.,* 556 F.3d 282, 285, n. 2 (5th Cir. 2009).  As no party has raised a conflict of law issue, no conflict-of-law analysis is necessary, and the forum law applies. *Id., citing Mumblow v. Monroe Broadcasting, Inc.,* 401 F.3d 616 (5th Cir. 2005).  Moreover, all parties argue for the application of Louisiana law.  R. Doc. 13, pp. 6-7; R. Doc. 18, p. 2.

[34] Renumbered from La R.S. § 22:680 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009. Redesignated from La. R.S. § 22:1406(D) by Acts 2003, No. 456, § 3.

provisions filed with and approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover nonpunitive damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness, or disease, including death resulting therefrom; however, the coverage required under this Section is not applicable when any insured named in the policy either rejects coverage, selects lower limits, or selects economic-only coverage, in the manner provided in Item (1)(a)(ii) of this Section. In no event shall the policy limits of an uninsured motorist policy be less than the minimum liability limits required under R.S. 32:900, unless economic-only coverage is selected as authorized in this Section. Such coverage need not be provided in or supplemental to a renewal, reinstatement, or substitute policy when the named insured has rejected the coverage or selected lower limits in connection with a policy previously issued to him by the same insurer or any of its affiliates….

(ii) Such rejection, selection of lower limits, or selection of economic-only coverage shall be made only on a form prescribed by the commissioner of insurance. The prescribed form shall be provided by the insurer and signed by the named insured or his legal representative. The form signed by the named insured or his legal representative which initially rejects such coverage, selects lower limits, or selects economic-only coverage shall be conclusively presumed to become a part of the policy or contract when issued and delivered, irrespective of whether physically attached thereto. A properly completed and signed form creates a rebuttable presumption that the insured knowingly rejected coverage, selected a lower limit, or selected economic-only coverage.

The statute embodies a "strong public policy."[35] The object of UM insurance is to provide full recovery for automobile accident victims who suffer damages caused by a tortfeasor who is not covered by adequate liability insurance.[36] UM coverage is determined not only by contractual provisions, but also by applicable statutes, such that the requirement of UM coverage is an implied amendment to any automobile liability policy, even when not expressly addressed, as UM

---

[35] *Duncan,* 950 So.2d at 547, *citing Roger v. Estate of Moulton,* 513 So.2d 1126, 1130 (La. May 18, 1987), *A.I.U. Ins. Co. v. Roberts,* 404 So.2d 948, 949 (La. Sept. 28, 1981).

[36] *Duncan,* 950 So.2d at 547, *citing Tugwell v. State Farm Ins. Co.,* 609 So.2d 195, 197 (La. Nov. 30, 1992); *Henson v. Safeco Ins. Companies,* 585 So.2d 534, 537 (La. Sept. 9, 1991); *Hoefly v. Government Employees Ins. Co.,* 418 So.2d 575, 578 (La. June 21,1982).

coverage will be read into the policy unless validly rejected.[37]  Further, the UM statute applies to personal insurance policies, commercial umbrella policies and personal umbrella policies.[38] Pursuant to La. R.S. § 22:1295(1)(c)(ii), a Louisiana tort victim occupying an automobile not owned by the injured victim, resident spouse or resident relative is permitted to recover UM under both a primary UM policy and an excess UM policy available to him/her, provided that, "[i]n no instance shall more than one coverage from more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant."[39]

The Louisiana Supreme Court has held that the UM statute is to be liberally construed,[40] which requires that statutory exceptions to coverage be interpreted strictly.[41] Any exclusion from coverage in an insurance policy must be clear and unmistakable.[42]  UM selection, selection of

---

[37] *Duncan,* 950 So.2d at 547, *citing Daigle v. Authement,* 96–1662 (La. 4/8/97), 691 So.2d 1213, 1214; *Henson,* 585 So.2d at 537.

[38] *See Green ex rel. Peterson v. Johnson*, 2014-0292 (La. 10/15/14), 149 So.3d 766, 771 ("Under the UM statute, currently LSA–R.S. 22:1295, the requirement of UM coverage is an implied amendment **to any automobile liability policy**, even when not expressly addressed, as UM coverage will be read into the policy unless validly rejected," (emphasis added), *citing Duncan*, 950 So.2d at 547; *Southern American Ins. Co. v. Dobson,* 441 So.2d 1185, 1192 (La. Feb. 23, 1983) (on rehearing) ("The effect of today's decision will be to require insurance companies doing business in this state to offer uninsured motorist coverage to an insured under the provisions of **umbrella and excess policies** when those policies cover 'liability arising out of the ownership, maintenance, or use of any motor vehicle.')(emphasis added); *Tugwell,* 609 So.2d at 199 ("On November 4, 1983 in *Southern American Insurance v. Dobson,* 441 So.2d 1185, 1190 (La. Feb. 23, 1983), this court found on rehearing that the UM statute, La. Rev. Stat. § 22:1406, was applicable to umbrella policies.").

[39] *See* 15 La. Civ. L. Treatise, Insurance Law & Practice § 4:27 (4th ed.) *and see Rowe v. Williams,* 41,082 (La. App. 2 Cir. 8/23/06), 938 So.2d 1185, 1187 ("The [La. R.S. §22:1295 (1)(c)(ii)] exception is only applicable in the instance of a person suffering injury while occupying an automobile not owned by that injured person, a resident spouse, or resident relative.") The entirety of La. R.S. § 22:1295(1)(c) provides: "If the insured has any limits of uninsured motorist coverage in a policy of automobile liability insurance, in accordance with the terms of Subparagraph (1)(a) of this Section, then such limits of liability shall not be increased because of multiple motor vehicles covered under such policy of insurance, and such limits of uninsured motorist coverage shall not be increased when the insured has insurance available to him under more than one uninsured motorist coverage provision or policy; however, with respect to other insurance available, the policy of insurance or endorsement shall provide the following with respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, resident spouse, or resident relative, and the following priorities of recovery under uninsured motorist coverage shall apply: (i) The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary.  (ii) Should that primary uninsured motorist coverage be exhausted due to the extent of damages, then the injured occupant may recover as excess from other uninsured motorist coverage available to him. In no instance shall more than one coverage from more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant."

[40] *Duncan,* 950 So.2d at 547, *citing Daigle,* 691 So.2d at 1214 and *Roger,* 513 So.2d at 1130.

[41] *Duncan* at *id., citing Roger,* 513 So.2d at 1130.

[42] *Duncan* at *id., citing Daigle,* 691 So.2d at 1214 and *Roger,* 513 So.2d at 1130.

lower UM limits, and rejection of UM coverage must be on a form promulgated by the Commissioner of Insurance.[43]  The insurer bears the burden of proving any insured named in the policy rejected in writing the coverage equal to bodily injury coverage or selected lower UM limits.[44]  However, once the insurer has shown that a rejection form is valid, the burden shifts to the insured to prove otherwise.[45]

### B. There is No Genuine Issue of Material Fact That the Business Owner's Policy Does Not Provide UM Coverage for the Accident

Defendants' Motion addresses five policies issued by Defendants, under which Defendants anticipated Plaintiffs would attempt to seek UM coverage for the Accident.[46]  The first of these, Policy No. 98-BF-P127-1 (the "Business Owner's Policy"),[47] was issued by SFF to the Decedent's mother, Patsy, and the Amoroso Family Limited Partnership, which is a family business that owns a group of properties.[48]  Defendants contend that the Business Owner's Policy does not provide UM coverage for the Accident because it only provides property insurance for the properties owned by the family business, and because "the express, unambiguous Business Owner's Policy language clearly does not provide UM coverage for the subject accident, as Buddy Amoroso simply does not meet the definition of an insured for purposes of the UM coverage."[49]  Plaintiffs do not dispute that the Business Owner's Policy does not provide UM coverage for the Accident.[50]

---

[43] La. R.S. § 22:1295 (1)(a)(ii).

[44] *Duncan*, 950 So.2d at 547, *citing Tugwell*, 609 So.2d at 197; and *see* La. R.S. § 22:1295(1)(a)(ii) (providing that a properly completed and signed form creates a rebuttal presumption that the insured knowingly rejected UM coverage or selected lower UM limits).

[45] *Dixon v. Gene Moody Trucking, Inc*., 36,420 (La. App. 2 Cir. 10/23/02), 830 So.2d 392, 394, *citing Franklin v. Coleman*, 34,908 (La. App. 2d Cir. 8/22/01), 793 So.2d 467.

[46] R. Doc. 13-1, pp. 2-3, 4-5.  The Business Owner's Policy does not appear to be referenced in the Petition.

[47] R. Doc. 13-8 (Affidavit of Defendants' Representative Lisa Snyder ("Snyder")) and R. Doc. 13-10.

[48] At the time of the Accident, the partners were Patsy, the Decedent, and the Decedent's siblings, JoAnn Alford, Vickie Keith, Lori Planchard, and Mary Pat Thevenot.  *See* the deposition transcript of JoAnn Alford ("Alford") at R. Doc. 13-16, p. 9 and the deposition transcript of Denise at R. Doc. 13-13, p. 19.

[49] R. Doc. 13-1, p. 19.

[50] *See* Opposition at R. Doc. 18, p. 3: "With the exception of the Business Owners Policy, which plaintiffs agree does not provide UM coverage to them for the incident made the basis of this litigation….," and Cross Motion at R. Doc. 17, p. 2, n. 1: "There is also a Business Owners Policy that provides UM coverage, but by the terms of said policy, it

Although a district court may not grant summary judgment simply because a party's motion is unopposed, "[i]f a party ... fails to properly address another party's assertion of fact as required by Rule 56(c)," then "the [district] court may ... consider the fact undisputed for the purposes of the motion [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."[51]  The Business Owner's Policy does not appear to provide UM coverage for the Accident;[52] Plaintiffs have not raised any factual dispute to challenge Defendants' assertions that the Business Owner's Policy does not provide UM coverage for the Accident; and Plaintiffs have conceded that the Business Owner's Policy does not provide UM coverage for the Accident.

As there is no genuine issue of material fact, Defendants' Motion will be granted to the extent it seeks a judgment that the Business Owner's Policy does not provide UM coverage for the Accident.

### C.  There is No Genuine Issue of Material Fact That the Personal UM Selection Form Validly Selected Lower Limits of UM Coverage, and the PLUP Selection Form Validly Waived UM Coverage

#### 1.  Personal Auto Policy and Personal UM Selection Form

The second policy at issue is Policy No. 581 3439-B07-18Q, the "Personal Auto Policy,"[53]

---

does not provide coverage to plaintiffs for the instant matter, so it will not be addressed."  *See also* Defendants' Combined Opposition/Reply at R. Doc. 21, p. 2.

[51] *Vasudevan v. Administrators of Tulane Educational Fund,* 706 Fed. App'x 147, 152 (5th Cir. 2017), *citing* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or (4) issue any other appropriate order.").  *See also Calais v. Theriot*, 589 Fed.Appx. 310, 311 and n. 4 (5th Cir. 2015) (per curiam).

[52] *See* R. Doc. 13-10, p. 50, defining an insured as "Anyone for 'bodily injury' sustained while 'occupying,' with your permission, a 'non-owned auto'…is an insured, provided that such vehicle is being used in connection with your business at the time of the accident."  Decedent does not meet the definition, as he was killed while a riding a bicycle as a personal hobby and not in the course of business.  *See* R. Doc. 13-1, pp. 19-20; R. Doc. 13-12, pp. 38-39; R. Doc. 17-15.

[53] In their briefs, Plaintiffs refer to this policy as the "Personal Policy."  R. Doc. 18, pp. 4-5; R. Doc. 17, p. 2.

issued by SFM to Decedent.[54]  Defendants contend that the Personal Auto Policy was first issued

to Decedent and Denise in the late 1980s or early 1990s and was continuously renewed through

Stewart, their State Farm agent.[55]  According to Defendants, the underlying liability limits of this

policy at the time of the Accident were $250,000 per person/$500,000 per accident, and the

underlying limits of UM coverage were $100,000 per person/$350,000 per accident,[56] with the

lower limits of UM coverage resulting from a properly executed UM Bodily Injury Coverage Form

("Personal UM Selection Form") promulgated by the Commissioner and properly executed by the

Decedent on July 20, 2000.[57]  Defendants argue that the Personal Auto Policy liability limits did

not change from 2000 until the date of the Accident and Decedent never requested UM coverage

in excess of the selected lower limits.[58]

The unconditional tender of $100,000 to Plaintiffs represents the stated limit of the UM

bodily injury coverage under the Personal Auto Policy, which Defendants contend is the only

applicable UM coverage under any insurance policy at issue.[59]  Defendants argue that they are

entitled to La. R.S.§ 22:1295's rebuttable presumption that the selection of lower UM coverage

was valid, and Decedent's selection of lower limits should be enforced because "there simply

exists no legitimate basis for contesting the validity" of the Personal UM Selection Form.

Defendants explain that Decedent's lower limits selection complied with all six of the factors set

---

[54] R. Doc. 13-5 (Affidavit of Defendants' Representative Aaron Angel ("Angel") and R. Doc. 13-6.  Decedent is listed as the insured on the Policy declarations page, but according to Stewart, Denise was also an insured as the spouse of Decedent.  *See* R. Doc. 13-12, p. 38.  The Ford Mustang listed on the declarations page is Denise's car.  R. Doc. 13-13, p. 20. Denise did not have any involvement in obtaining the Personal Auto Policy.  R. Doc. 13-13, p. 22.

[55] R. Doc. 13-1, p. 9; R. Doc. 13-12, p. 12  (Stewart deposition).

[56] R. Doc. 13-1, pp. 9-10; R. Doc. 13-5; R. Doc. 13-6, p. 2.

[57] R. Doc. 13-1, p. 10; R. Doc. 13-6, p. 65.

[58] R. Doc. 13-1, p. 10; R. Doc. 13-12, pp. 13-14, 30-31. According to Stewart, in 2000, State Farm increased the minimum levels of required automobile liability coverage in the liability policy underlying the PLUP.  Thus, Decedent was required to increase his underlying automobile liability coverage and completed new UM selection forms for the underlying automobile policy and the PLUP at that time.  R. Doc. 13-12, pp. 13-14, 48-49.  Stewart confirmed that the Personal Auto Policy was the automobile policy underlying the PLUP at the time of the Accident. R. Doc. 13-12, pp. 20-21.

[59] R. Doc. 13-5 (Angel affidavit); R. Doc. 13-1, p. 11.

out in the Louisiana Supreme Court's *Duncan* decision,[60] as follows: Decedent properly initialed in the open blank next to the second option on the Personal UM Selection Form, selecting UM bodily injury coverage with lower limits than the Personal Auto Policy's liability bodily injury coverage. The lower limits of $100,000 per person/$300,000 per accident are reflected in each open blank in the second option. Decedent's printed name appears above the open blank for the named insured. Decedent's name appears above the open blank for the signature of the named insured. The policy number "581 3439-B07-18" is indicated above the open blank for policy number. Finally, the effective date of "7-20-00" is indicated above the open blank for date.[61] Defendants also rely on Denise's testimony that the Personal UM Selection Form contains Decedent's signature and initials.[62]

Plaintiffs contend that Defendants have failed their burden of proving the existence of a validly executed UM selection form for each policy.[63] Plaintiffs argue that, while Defendants have established that Decedent's signature and initials are on the Personal UM Selection Form, Defendants have not established compliance with *Duncan* and the August 29, 2008 Louisiana Department of Insurance Bulletin No. 08-02 ("Bulletin No. 08-02),[64] because Defendants have

---

[60] *See Duncan,* 950 So.2d at 551 ("[The prescribed form involves six tasks ["*Duncan* tasks"]: (1) initialing the selection or rejection of coverage chosen; (2) if limits lower than the policy limits are chosen (available in options 2 and 4), then filling in the amount of coverage selected for each person and each accident; (3) printing the name of the named insured or legal representative; (4) signing the name of the named insured or legal representative; (5) filling in the policy number; and (6) filling in the date.").

[61] R. Doc. 13-1, p. 10; R. Doc. 13-6, p. 65.

[62] R. Doc. 13-1, p. 10, R. Doc. 13-13, p. 26.

[63] R. Doc. 18, p. 4; R. Doc. 17-2, p. 11.

[64] R. Doc. 13-14. The Louisiana Commissioner of Insurance is tasked with prescribing the required UM Selection Form. La. R.S. § 22:1295(1)(a)(ii). Bulletin No. 08-02, however, does not require the insertion of the policy number as per the fifth *Duncan* factor: "The following tasks [are to] be completed by the insured: (1) His/Her signature; (2) His/Her printed name to identify his/her signature; (3) The date the form is completed; and (4) Initials to select/reject UMBI coverage prior to signing the form." *See* R. Doc. 13-14, p. 3. And, if the insured selects lower UM limits, "the exact amount of coverage must be printed on the appropriate line on the revised UM form prior to the insured signing the form." *Id.* Despite the language of Bulletin No. 08-02 referring to "the insured" completing these tasks, Louisiana jurisprudence is clear that the law does not require the insured to personally complete these tasks, as discussed more fully below.

failed to: (1) identify who wrote in the lower UM limits selected on the Personal UM Selection Form; (2) identify who printed Decedent's name on the form;[65] (3) identify who filled in the date on the form; and (4) identify when the lower limits were filled in, when Decedent initialed the form, and when Decedent's name was printed on the form.[66] Plaintiffs argue that identification of who completed the lower UM limits is required because the lower limit selection could have been filled in after Decedent signed and dated the form, and proving that Decedent printed his name is required, because without such proof, Defendants cannot prove that Decedent "identified his signature."[67] Plaintiffs contend that the Personal UM Selection Form should be found invalid and the Personal Auto Policy should afford the same UM limits as afforded by the Personal Auto Policy's liability limits, i.e., $250,000.[68] In support, Plaintiffs rely on *Ware v. Gemini Ins. Co.*,[69] in which Louisiana's Third Circuit Court of Appeal held that a UM selection form was invalid when the representative of the insurance agent entered a lower UM limit on the form without first discussing the lower limit with the insured.[70] Plaintiffs argue that, at a minimum, a genuine issue of material fact exists as to when, and by whom, the *Duncan* tasks were performed, and Defendants' failure to prove these elements invalidates the Personal UM Selection Form.

Defendants respond that Plaintiffs' argument fails "as it sets forth an inaccurate recitation of the applicable burden of proof and relies on an incorrect legal standard."[71] According to Defendants, because the Personal UM Selection Form is on the form prescribed by the Commissioner of Insurance and all six *Duncan* tasks were fully completed, that creates a rebuttable

---

[65] *See* R. Doc. 13-14, p. 3.
[66] R. Doc. 18, pp. 4-5; R. Doc. 17-2, p. 3.
[67] R. Doc. 18, p. 5.
[68] R. Doc. 18, p. 5; R. Doc. 17-2, p. 3, 12.
[69] 2010-594 (La. App. 3 Cir. 11/24/10), 51 So.3d 179, *writ denied*, 2010-2834 (La. 4/29/11), 62 So.3d 108, and *writ denied*, 2011-0286 (La. 4/29/11), 62 So.3d 112.
[70] R. Doc. 18, p. 5 and R. Doc. 17-2, p. 12, *both citing* 51 So.3d at 183.
[71] R. Doc. 21, pp. 3, 19.

presumption in Defendants' favor and shifts the burden to Plaintiffs to prove that the Personal UM

Selection Form is invalid.[72]    Defendants argue that Plaintiffs have failed to come forward with

specific facts and evidence to rebut the presumption, as Denise's testimony confirms that

Decedent's signature and initials are on the Personal UM Selection Form,[73] and Denise had no

knowledge or information to show that Decedent intended to select UM coverage other than that

selected on the Personal UM Selection Form. Stewart also testified that Decedent was

sophisticated and understood UM coverage, which testimony is unchallenged by Plaintiffs.[74]

With respect to Plaintiffs' challenges as to the completion of Decedent's printed name,

date, and lower UM limits, Defendants contend that "Louisiana jurisprudence and associated

authorities are clear that the law does not require the insured fill out the entire form."[75] Defendants

rely on *Duncan* and several other state appellate and supreme court cases, to-wit:[76] *Williams v.

Mosley* (holding that the fact that the insured did not personally fill in his name and the date on the

UM selection form did not invalidate a waiver of UM coverage initialed and signed by the

insured);[77] *Ponce v. Welch* (affirming summary judgment in favor of the insurer and holding that

the fact that the insured's name was typed by someone else, instead of being printed by the insured,

did not invalidate the form);[78] *Brice v. State Farm Mutual Automobile Insurance Company,*

(holding that Bulletin No. 08–02 does not explicitly state that the blank in which the amount of

---

[72] R. Doc. 21, pp. 4, 20.

[73] R. Doc. 21, pp. 20-21; R. Doc. 13-13, p. 26.

[74] R. Doc. 21, p. 21, *citing* R. Doc. 13-13, p. 27 *and see* R. Doc. 13-12, pp. 43-45, 48-49. *See also* R. Doc. 13-12, p. 30 (Stewart testimony that Decedent did not request UM coverage above the amount he selected) and R. Doc. 13-12, p. 31 (Stewart testimony that he had discussions with Decedent about UM coverage that Decedent understood, and Decedent was an intelligent man).

[75] R. Doc. 21, pp. 3-4.

[76] All cited at R. Doc. 21, pp. 17-19 in support of dismissal of Plaintiffs' claims under the PLUP, but Defendants re-urge and incorporate this authority in support of dismissal of Plaintiffs' claims under the Personal Auto Policy at R. Doc. 21, pp. 21-22.

[77] 2019-0578 (La. App. 1 Cir. 1/9/20), 294 So.3d 1060, 1065-66.

[78] 15-669 (La. App. 5 Cir. 3/16/16), 191 So.3d 73, 78, *writ denied,* 2016-00720 (La. 6/3/16), 192 So.3d 751.

UM coverage must be completed must be filled in by the insured if the insured selects lower limits. It merely requires that the insured make the selection, and Bulletin No. 08–02 also does not require the insured to physically type or print his/her name on the form, only that the name of said insured is on the form);[79] *Taylor v. U.S. Agencies Cas. Ins. Co.* ("The law does not require that the insured fill out the [UM selection/rejection waiver] form.");[80] *Lynch v. Kennard* (holding that the insured's waiver of UM coverage was valid, despite that the insured's secretary wrote the date on his UM selection form. The court noted that the form on its face was "properly completed," and that a properly completed and signed form creates a rebuttable presumption that the insured knowingly rejected UM coverage. The UM rejection form was signed by the named insured and the blank next to the option for rejecting UM coverage was initialed by the insured. The insured's name was typed on the form and the policy number was typed on the form, not written by the insured himself, but the form was found to be valid);[81] and finally, *Stone v. Allstate Property and Casualty Insurance Company,* ("In no way does the form prescribe that the insured must initial the selection or rejection before signing it.").[82] Defendants also distinguish *Ware*, Plaintiffs' cited authority, because in *Ware* the insurance agent testified that she selected a lower limit without discussing it with the insured, which action was held to vitiate the insured's consent and which rebutted the presumed validity of the form. Defendants aver that no such evidence exists in this case, and in fact, Stewart testified that he spoke with Decedent about UM coverage and Decedent understood UM coverage.[83] Moreover, even in *Ware*, the Court recognized that someone other than the insured can perform the "clerical task of entering the amount on the form…."[84]

---

[79] 51,393 (La. App. 2 Cir. 6/21/17), 223 So.3d 1250, 1255, *writ denied,* 2017-1285 (La. 11/17/17), 228 So. 3d 1218.

[80] 2009-1599 (La. App. 1 Cir. 4/7/10), 38 So.3d 433, 437.

[81] 09–282 (La. 5/15/09), 12 So.3d 944.

[82] 2018-547 (La. App. 3 Cir. 3/7/19), 269 So.3d 961, 964.

[83] R. Doc. 21, p. 25; R. Doc. 13-12, pp. 30-31, 43-45, 48-49.

[84] 51 So.3d at 183.

The parties agree that the Personal UM Selection Form, dated July 20, 2000, is the operative form.[85] While Plaintiffs contest the legal effect of the form, there is no dispute that the form contains Decedent's signature and initials.[86] Defendants have sustained their burden of proving that Decedent properly executed a  completed Personal UM Selection Form, which gives rise to the rebuttable presumption in Defendants' favor under La. R.S. § 22:1295(1)(a)(ii).[87] Plaintiffs' only argument is that Defendants cannot show who filled in the dates for the printed name, lower UM limits, and date, or establish when those blanks were filled in.  However, the law is clear that once Defendants establish that the form was properly executed, the burden shifts to Plaintiffs to rebut the presumption that the form was valid.[88] Plaintiffs have not come forward with any evidence that would rebut the presumption. Even if another person entered Decedent's printed name, amount of lower UM limits, or printed date on the Personal UM Selection Form, the litany

---

[85] R. Doc. 13-5, ¶ 5 (Angel Affidavit); R. Doc. 13-6, p. 65 (July 2000 Personal UM Selection Form); R. Doc. 13-2, p. 2, ¶ 8 (Defendants' Statement of Undisputed Material Facts); R. Doc. 17-1, p. 3, ¶ 16 (Plaintiffs' Statement of Uncontested Facts acknowledging the July 2000 Personal UM Selection Form); R. Doc. 17-5, p. 3 (July 2000 Personal UM Selection Form attached to Plaintiffs' Cross Motion).  The parties also agree that the Personal Auto Policy with declarations page prepared on December 27, 2010 is the operative policy.  R. Doc. 13, p. 2; R. Doc. 13-1, p. 2; R. Doc. 13-2, p. 2;  R. Doc. 13-5, p. 1; R. Doc. 13-6, p. 2 and R. Doc. 17, p. 2; R. Doc. 17-5, p. 2; and R. Doc. 18-1, p. 1, ¶ 6.  The Personal Auto Policy's Certified Policy Record confirms that "The policy was in effect on the loss date of 06/30/18," despite that the declarations page indicates the date prepared as December 27, 2010 with a policy period of December 21, 2010 to August 7, 2011.  R. Doc. 13-6, pp. 1-2. According to the declarations page, Defendants issue a new declarations page "only when a policy issuance transaction such as a change of coverage occurs."  R. Doc. 13-6, p. 1.

[86] R. Doc. 13-2, p. 2, ¶ 11 (Defendants' Statement of Uncontested Facts); R. Doc. 18-1, p. 2, ¶ 11 (Plaintiffs' Opposing Statement of Material Facts admitting that the signature and initials are that of Decedent); R. Doc. 17-1, p. 3, ¶ 16 (Plaintiffs' Statement of Uncontested Facts admitting that Decedent's signature and initials on the Personal Auto Policy had been positively identified); R. Doc. 18, p. 5, *citing* R. Doc. 13-13, p. 26 (Plaintiffs' Opposition citing Denise's testimony identifying Decedent's signature on the Personal UM Selection Form); *and see* Plaintiffs' Opposition at R. Doc. 18, p. 4 (Plaintiffs' statement that Defendants can only carry their burden of proof with respect to the fact that the signature and initials on the Personal UM Selection Form are that of Decedent), *accord* Plaintiffs' Memorandum in Support of Cross Motion at R. Doc. 17-2, p. 12.

[87] *See Duncan,* 950 So.2d at 552 ("The statute dictates that a 'properly completed and signed form,' is now presumed to constitute a knowing waiver of UM coverage. This presumption exists because the prescribed form, if properly completed, clearly evidences the insured's intent to waive UM coverage. The legislature, therefore, shifts the analysis away from the muddied question of whether the insured made an informed decision to knowingly waive coverage. Instead, the legislature states if the insurer uses the form prescribed by the commissioner of insurance and makes certain that it is properly completed and signed, then the insurer receives a presumption that the insured's waiver of coverage was knowing.").

[88] *See Dixon v. Direct General Ins. Co. of Louisiana,* 2008-0907 (La. App. 1 Cir. 3/27/09), 12 So.3d 357, 362.

of cases cited by Defendants hold that the completion of that information by another person is a "clerical task" that does not invalidate the form, so long as the insured's name and date are on the form, and the insured has selected the lower UM limits.[89]  Unlike *Ware*, in which *it was undisputed* that the insurer's representative, who performed the clerical task of filling in the lower limits, did not discuss the amount of the lower limits selected with the insured and unilaterally selected the amount of the lower limits, Plaintiffs have not offered any evidence to show that Decedent did not personally select the lower UM limits.[90]   In fact, the only evidence of record on this point is Stewart's testimony that he specifically remembered speaking with Decedent "extensively" in "a full conversation" about UM coverage as to either the Personal Auto Policy, the PLUP, or both because Decedent's PLUP was up for renewal, Defendants had raised the underlying policy limits for the continuation of PLUP coverage, and Decedent's father was dying.[91] Stewart testified that Decedent was aware of what UM coverage entailed, Decedent was an intelligent man, and Decedent "made the decision he made" regarding UM coverage.[92]   Denise testified that she did not have any information that Decedent intended to select a coverage other than what was on the Personal UM Section Form.[93]

---

[89] *See Brice,* 223 So.3d at 1250 and the other cases cited by Defendants in the text, *supra. See also Jordan v. Safeco Insurance Company of Oregon,* No. 15-00498, 2016 WL 258640, at *3 (M.D. La. Jan. 20, 2016) ("[W]hile a valid waiver form requires a printed name to identify the insureds accompanying signature, the Court finds no requirement that such 'printed name' be in the handwriting of the insured. *See Banquer v. Guidroz*, 2009-466, pp. 1-4 (La. 5/15/09); 8 So.3d 559, 561. The purpose of the printed name requirement is to make the accompanying signature—often written illegibly—readily identifiable. *Id.* That Mr. Jordan's name is typed on Defendant's form rather than printed by hand only made it more certain that his signature can be properly identified.")  Plaintiffs also do not explicitly deny that Decedent completed the disputed blanks.  *See Soto v. Sentry Select Ins. Co.,* No. 12-01431, 2012 WL 5363330, at *3 (E.D. La. Oct. 30, 2012) (Where insured admitted her signature but could not authenticate her initials or the date on the UM form, holding: "The lack of authentication of the initials is insufficient to rebut the presumption of waiver, where [Plaintiff] admits the signature is her own and does not explicitly deny the initials and the date as her own.").

[90] The *Ware* court noted: 'This is not the case where the agent performed a clerical task of *filling in* the amount after a discussion in which the *insured selected* the amount of the coverage. Instead, the agent selected and entered the amount, thereby effectively vitiating the *insured's choice.*" 51 So.3d at 182.

[91] R. Doc. 13-12, pp. 43-45, 48-49.

[92] R. Doc. 13-12, pp. 31, 43-45, 48-49.

[93] R. Doc. 13-13, p. 26.

There is no countervailing evidence offered by Plaintiffs suggesting that anyone else selected the lower UM limits and/or selected those limits after Decedent signed or initialed the form so as to raise a genuine issue of material fact that the Personal UM Selection Form is invalid. Accordingly, Defendants' Motion will be granted to the extent it seeks dismissal of any claim by Plaintiffs for additional UM coverage under the Personal Auto Policy for the Accident, as there is no dispute that Defendants have already tendered the Personal Auto Policy UM limits of $100,000.[94] Plaintiffs' Cross Motion will also be denied to the extent it seeks a judgment for UM coverage under the Personal Auto Policy in excess of the unconditional tender.

### 2. The PLUP and the PLUP UM Selection Form

The PLUP, Policy No. 18-BP-6902-6, provided one million dollars in single limit umbrella coverage in excess of the Personal Auto Policy and was originally issued in the mid-1990s by SFF to Decedent and Denise.[95] Although the PLUP was in effect on the date of the Accident, according to Defendants, Decedent declined UM insurance in the PLUP via validly executed UM Bodily Injury Coverage Forms ("PLUP UM Selection Forms") dated September 1, 2000, September 1, 2004, and June 8, 2009, which satisfy the *Duncan* factors.[96] The 2000 and 2004 forms bear Decedent's initials rejecting UM coverage, his signature, his printed name, the policy number and date. The 2009 PLUP UM Selection Form likewise bears Decedent's initials rejecting UM coverage, his signature, his printed name and date.[97] Defendants contend that, while the 2009 PLUP UM Selection Form does not contain the actual policy number, but rather the words "Personal Liability Umbrella Policy," the PLUP policy number was not required on the form in

---

[94] R. Doc. 13-2, p. 2, ¶ 12; R. Doc. 18-1, p, 2, ¶ 12 (no dispute that the tender was issued and negotiated) *and see* the Stipulation at R. Doc. 12, p. 2, ¶ 2.

[95] R. Doc. 13-8 (Snyder Affidavit); R. Doc. 13-9, p. 2; R. Doc. 13-12, pp. 14, 157 (errata sheet clarifying that the PLUP coverage was one million dollars). Decedent and Denise are both listed as insureds on the Policy declarations page. R. Doc. 13-9, p. 2.

[96] R. Doc. 13-1, p. 11; R. Doc. 13-9, pp. 18-20.

[97] R. Doc. 13-1, p. 12.

order to constitute a properly completed UM rejection by virtue of Bulletin No. 08-02.[98] Defendants argue that Plaintiffs have no evidence to refute that Decedent's signature and initials are on each of the PLUP UM Selection Forms, as confirmed by Denise,[99] and that Decedent alone handled the insurance coverage decisions.[100] Defendants also rely on Stewart's testimony that Decedent understood the impact of rejecting UM coverage.[101]  Finally, Defendants contend that, because the liability limits of the PLUP did not change from 2000 until the Accident, and the liability limits of the Personal Auto Policy did not change after 2000, Defendants were not legally required to obtain the 2004 and 2009 PLUP UM Selection Forms.  However, both such forms are valid and enforceable, entitling Defendants to summary judgment.[102]

In response, Plaintiffs re-urge the same arguments raised with respect to the Personal Auto Policy, *i.e.*, while Defendants have carried their burden with respect to Decedent's signature and initials, Defendants cannot prove who printed Decedent's name and the date on the form, or the date on which Decedent's name and initials rejecting coverage were filled in on the form.[103] Plaintiffs also argue that Defendants' reliance on Stewart's testimony about Decedent's knowledge regarding waiver of UM coverage is improper.[104]  Plaintiffs contend that these genuine issues of material fact as to the validity of the PLUP UM Selection Form require a finding that the policy affords UM coverage in the same amount as the liability coverage, *i.e.*, one million dollars.[105]

---

[98] R. Doc. 13-1, p. 12 *and see* Bulletin No. 08-02 at R. Doc. 13-14.
[99] R. Doc. 13-1, pp. 12-13 and R. Doc. 13-13, pp. 29-32.  Denise did not have any involvement in obtaining the PLUP, had no information to refute the information on the PLUP UM Selection Forms, and was unaware of the PLUP at the time of the Accident.  R. Doc. 13-13, pp. 21-22, 31-32.
[100] R. Doc. 13-1, p. 12; R. Doc. 13-13, pp. 21-22.
[101] R. Doc. 13-1, pp. 12-13, *citing* R. Doc. 13-12, pp. 43-45.
[102] R. Doc. 13-1, p. 13.
[103] R. Doc. 18, pp. 6-7; R. Doc. 17-2, pp. 3, 10-11.
[104] R. Doc. 18, p. 6.
[105] R. Doc. 18, p. 7; R. Doc. 17-2, pp. 3, 12.

In response, Defendants re-iterate the same arguments asserted with respect to the Personal Auto Policy, *i.e.*, the PLUP UM Selection Forms were fully completed and created a rebuttable presumption of validity.[106]  In support, Defendants rely on the same authority cited above for the proposition that UM selection forms are not invalidated when someone other than the insured fills in the name, date and selection of UM lower limit coverage.[107] Defendants argue that there is no dispute that the signature and initials rejecting UM coverage on the three PLUP UM Selection Forms belong to Decedent, which shifts the burden to Plaintiffs to prove that the PLUP UM Selection Forms are invalid.[108]

The parties agree that at least the 2009 PLUP UM Selection Form was operative at the time of the Accident.[109] While Plaintiffs contest the legal effect of the form, here again, there is no dispute that the form contains Decedent's signature and initials.[110]  The parties raise essentially the same arguments with respect to the validity of the PLUP UM Selection Form as they raise with respect to the Personal UM Selection Form, and Plaintiffs' challenge is rejected for the same reason, *i.e.*, even if someone else may have completed the spaces for Decedent's printed name and date, that does not invalidate the form, which undisputedly contains Decedent's signature and

---

[106] R. Doc. 21, p. 3.

[107] R. Doc. 21, pp. 16-19.

[108] R. Doc. 21, pp. 3, 19.

[109] R. Doc. 13-8, p. 2, ¶ 4 (Snyder Affidavit); R. Doc. 13-9, p. 20 (June 2009 PLUP UM Selection Form); R. Doc. 13-2, pp. 2-3, ¶ 15 (Defendants' Statement of Uncontested Facts); R. Doc. 17-1, p. 3, ¶ 16 (Plaintiffs' Statement of Uncontested Facts acknowledging the June 2009 PLUP UM Selection Form); R. Doc. 17-4, p. 4 (June 2009 PLUP UM Selection Form attached to Plaintiffs' Cross Motion).  The parties also agree that the PLUP prepared on July 18, 2017 is the one at issue herein. R. Doc. 13, p. 2; R. Doc. 13-1, p. 3; R. Doc. 13-2, p. 2, ¶ 14; R. Doc. 13-9 and R. Doc. 17, p. 2; R. Doc. 17-1, p. 2, ¶ 15; and R. Doc. 18-1, p. 2, ¶ 14.  The PLUP Certified Policy Record states: "The Policy was in effect on the loss date of 06/30/2018," and the declarations page indicates a policy period encompassing the date of the Accident, *i.e.*, September 1, 2017 to September 1, 2018. R. Doc. 13-9, pp. 1-2.

[110] R. Doc. 13-2, p. 3, ¶ 19 (Defendants' Statement of Uncontested Facts) and R. Doc. 18-1, p. 2, ¶ 19 (Plaintiffs admit that the signature and initials are that of Decedent); R. Doc. 17-1, p. 3, ¶ 16 (Plaintiffs' Statement of Uncontested Material Facts admitting that Decedent's signature and initials on the PLUP have been positively identified); R. Doc. 18, p. 7 (Plaintiffs' Opposition averring that Defendants can only carry their burden of proof with respect to the fact that the signature and initials on the PLUP UM Selection Form are that of Decedent), *accord* Plaintiffs' Memorandum in Support of Cross Motion at R. Doc. 17-2, pp. 3, 11.

initials by the UM rejection option.[111]  As the PLUP UM Selection Form is complete and executed, it is presumed valid and Plaintiffs have not offered any evidence to rebut the presumption that it is valid, or to show that Decedent's name and date were printed on the form after Decedent signed and initialed it.  Further, as with the Personal Auto Policy, the undisputed evidence shows that the UM waiver of coverage was knowingly made, as Stewart testified that he had discussions with Decedent regarding UM Coverage in the PLUP,  and it was Stewart's perception that Decedent understood those discussions and knowingly rejected such coverage.[112]  Denise did not have any information to suggest that Decedent intended anything other than to reject UM coverage in the PLUP as indicated on the selection form.[113]

Plaintiffs do not assert that the 2009 PLUP UM Selection Form is invalid because it does not contain the PLUP Policy number; however, such argument does not have merit based on the application of Bulletin No. 08-02, which permitted, but did not require, insurers to use a revised Department of Insurance UM Selection Form from September 1, 2008 until January 1, 2010.  This appears to be the same as the 2009 PLUP UM Selection Form.[114]  The Bulletin does not require that the policy number be written on the form:

> Policy number and other policy identification information – The revised UM form includes two boxes on the lower right hand corner of the form. The upper box contains an area that the insurer may use for policy information purposes (e.g. policy number, binder number, number, application number, etc.). **This box does not need to be filled in for the form to be properly completed**.[115]

---

[111] R. Doc. 13-9, p. 20.
[112] R. Doc. 13-12, pp. 30-31, 43-45, 48-49.  To the extent Plaintiffs disagree with Stewart's perception, that does not create a genuine issue of material fact because Plaintiffs have not put forward any contradictory evidence.  Alford also testified that Decedent was "very knowledgeable" about insurance issues. *See, e.g.*, R. Doc. 13-16, pp. 11-12.
[113] R. Doc. 13-13, p. 31.
[114] R. Doc. 13-14, p. 2, and *compare* R. Doc. 13-14 p. 4 *with* R. Doc. 13-9, p. 20.
[115] R. Doc. 13-14 (emphasis added).

Defendants are correct that the lack of the PLUP policy number did not invalidate the 2009 PLUP UM Selection Form.[116]

As Defendants have presented a validly executed form that rejects UM coverage and Plaintiffs have not presented evidence to raise an issue of fact as to the validity of the form, Defendants' Motion will be granted to the extent it seeks dismissal of any claim by Plaintiffs for UM coverage under the PLUP for the Accident because PLUP UM coverage was validly rejected by Decedent.  Plaintiffs' Cross Motion will be denied to the extent it seeks a judgment for UM coverage under the PLUP.

### D.  There is No Genuine Issue of Material Fact That Decedent is Not an "Insured" on the Infiniti Policy and Plaintiffs Have Not Provided Clear and Convincing Evidence of Mutual Mistake for Reformation

The fourth policy at issue is Policy No. L00 1563-F06-187L (the "Infiniti Policy"),[117] which was issued by SFM.  Decedent's mother, Patsy, is the only individual listed as a named insured on the Infiniti Policy and a 2014 Infiniti QX60 is the only listed vehicle.[118]  The Infiniti was owned by Prime Properties, LLC ("Prime"),[119] Decedent's employer.[120]  Prime paid the premiums for the Infiniti and provided the Infiniti for Decedent's business use, but Decedent also used the Infiniti for personal reasons and drove it on a regular basis.[121]

---

[116] *Osborne v. Benson*, No. 15-02845, 2017 WL 4365821, at *4 (W.D. La. Sept. 29, 2017) *citing Guidry v. Geico General Insurance Company,* No. 15-1518, 2015 WL 9002408, at *3 (E.D. La. Dec. 16, 2015).  *See id.*: "Thus, under the commissioner's current regulations, the policy number is optional; the number need not be present in order for a UM waiver form to be valid."

[117] Plaintiffs refer to this policy as the "Vehicle Policy." *See, e.g.,* R. Doc. 18, p. 7; R. Doc. 17-2, p. 8.  Defendants refer to this policy as the "Business Auto Policy."  R. Doc. 13-1, pp. 3-4, 13-19 and R. Doc. 21, pp. 3, 13-16.  However, both parties agree that the Infiniti Policy was not a commercial or business policy.  R. Doc. 13-1, p. 3, n. 7; R. Doc. 18, p. 8; R. Doc. 17-2, p. 8.  To avoid confusion, the Ruling refers to this policy as the "Infiniti Policy" since it specifically insured an Infiniti automobile.

[118] R. Doc. 13-7, p. 2.

[119] Prime is owned by Patsy and is the management company that oversees management of the properties owned by the Amoroso Family Limited Partnership. R. Doc. 13-16, pp. 7-10, 14-15 (deposition testimony of Alford, the Chief Financial Officer of Prime).

[120] R. Doc. 13-16, pp. 12-14.

[121] R. Doc. 13-13, pp. 36, 75-76; R. Doc. 13-16, pp. 14, 16; R. Doc. 17-9, p. 6 (Traina's deposition transcript); R. Doc. 17-10, pp. 6-7 (Swart's deposition transcript); R. Doc. 17-11, p. 6 (Anthony's deposition transcript); and R. Doc. 13-

Defendants admit that the Infiniti Policy provides UM coverage of up to $500,000 per person and per accident;[122] however, Defendants contend that the UM coverage provided by the Infiniti Policy was not triggered by the circumstances of the Accident.  Specifically, Defendants argue that Decedent fails to qualify as an "insured" under the Infiniti Policy because he was not a named insured or resident relative of the named insured (*i.e.*, Patsy), nor was he occupying the named insured's car (or any car) at the time of the Accident.[123]

Additionally, Defendants argue that the Infiniti Policy should not be reformed to include Decedent as an insured because "there is no legal basis to do so;" however, even if this Court were to consider reformation, there is no evidence of mutual error. Rather, Alford, the Chief Financial Officer ("CFO") of Decedent's employer, Prime, testified that Decedent was not intended to be an insured under the Infiniti Policy, and Stewart testified that the Infiniti Policy was written with Patsy as the named insured based upon the client's request.[124] Defendants distinguish this case from *Samuels v. State Farm Mut. Auto. Ins. Co.,* ("*Samuels*"), in which the Louisiana Supreme Court reformed the insurance policy.[125] Rather, Defendants argue that the facts of this case are closer to those in *American Electric*, in which the U.S. Court of Appeals for the Fifth Circuit

---

15, p. 7 (Patsy's deposition transcript (no one else besides Decedent drove the Infiniti on a regular basis)).  After Decedent's death, Patsy donated the Infiniti to Denise.  R. Doc. 13-13, p. 69.

[122] R. Doc. 13-7, p. 2, which provides UM coverage limits of $500,000 for each person and $500,000 for each accident.
[123] R. Doc. 13-1, pp. 14-17.  The fourth definition of "insured" applies to "any person entitled to recover …damages as a result of bodily injury to an insured as defined in 1., 2., or 3. Above." Because Decedent does not qualify as an "insured" pursuant to the other three subcategories, Defendants argue that the fourth definition is not implicated.
[124] R. Doc. 13-1, p. 18, *citing* R. Doc. 13-16, pp. 14-16, and R. Doc. 13-12, pp. 33-34, 36.
[125] R. Doc. 13-1, p. 18, *citing Samuels*, 2006-0034 (La. 10/17/06), 939 So. 2d 1235, 1240 (reforming excess umbrella insurance policy issued by Evanston Insurance Co. to reflect the intention of the parties that the Evanston umbrella policy was issued to be in excess of the insured's State Farm umbrella policy based on uncontroverted affidavits from three insurance agents that attested that the insureds desired an Evanston umbrella policy in excess of their State Farm umbrella policy and that clerical errors resulted in Evanston's failure to first properly identify the State Farm umbrella policy type on the declaration page of the original excess policy, and then failed to properly identify the State Farm policy type and number on the renewal excess policies, as well as based on the amount of the reduced premiums.  The *Samuels* court noted that State Farm did not assume or rely on the Evanston excess policy in any way and had to know that the reference to the incorrect State Farm policy number and policy type was a mistake because it failed to refer to an actual policy. *Id.* at 1241.).

declined reformation in the absence of any allegation that the insurer committed an error.[126]  To the extent Plaintiffs seek reformation, Defendants argue that Plaintiffs must show "clear proof of the antecedent agreement as well as the error in committing it to writing."[127]

Plaintiffs do not appear to dispute that Decedent is not named an "insured" on the Infiniti Policy; rather, Plaintiffs argue that the Infiniti Policy should be reformed to include Decedent as a named insured because Defendants knew or should have known of the following "arrangement:" on and before the Accident, Decedent drove the Infiniti for both personal and business use; the Infiniti was owned by Prime and insured under the Infiniti Policy, which was issued to Patsy as the owner of Prime; Prime paid for the Infiniti and the insurance premiums for the Infiniti Policy but Decedent possessed and operated the Infiniti; and, the Infiniti Policy was issued as a personal policy, not as a commercial or business policy.[128]  Plaintiffs point out that the Personal Auto Policy includes Endorsement 6049BC (the "Endorsement"), which is an endorsement for Decedent's use of non-owned vehicles.[129] It appears that Plaintiffs rely on the issuance of the Endorsement as additional evidence that Decedent was intended to be an insured under the Infiniti Policy.  In particular, Plaintiffs also rely on Alford's testimony that the Infiniti was intended to cover Decedent "as a driver" of the Infiniti.[130]  Plaintiffs argue that, since Decedent was a driver, "it was

---

[126] R. Doc. 13-1, p. 18 *citing* 556 F.3d at 288 (declining to reform the word "corporation" in a CHUBB insurance policy whose coverage obligations were assumed by insurer Affiliated, to include "limited liability companies" because "corporation" was clear and unambiguous, Affiliated was entitled to rely on the terms of the CHUBB policy under which it assumed coverage obligations, and "there is no allegation that CHUBB and [its insured] made a clerical error in using the word 'corporation.'").

[127] R. Doc. 13-1, p. 19, *citing First State Bank & Trust Co. of East Baton Rouge Parish v. Seven Gables, Inc.*, 501 So.2d 280, 285 (La. App. 1 Cir. 12/23/86).

[128] R. Doc. 18, pp. 7-8 and R. Doc. 17-2, p. 8, both *citing* the Infiniti Policy at R. Doc. 13-7, *and see, in particular*, the declarations page at p. 2; R. Doc. 13-12, pp. 14, 16.

[129] R. Doc. 18, p. 8 and R. Doc. 17-2, p. 8, *citing* R. Doc. 13-6, p. 6.

[130] R. Doc. 13-16, p. 17 (Alford's deposition).
    Q: "Was the policy intended to cover Buddy?"
    A: "[The Infiniti Policy] was intended to cover the owner of the Infiniti who had the insurable interest which is my mother, and every driver as well, you know, drivers, as a driver, yes."
    Q: "So it was intended to cover Buddy as a driver of that vehicle?"
    A: "As a driver, yes."

intended that he be covered by the policy, meaning it was intended he be an insured under the policy."[131]

Plaintiffs also rely on the Louisiana Supreme Court's *Smith v. Matthews* decision, in which the insurance policy at issue was reformed to provide coverage to an heir based on evidence that the insured named by the insurance agent was an estate, which is a non-entity, and that the heir of the estate and insurance agent clearly intended for the heir to be (one of) the named insureds,[132] and on the Louisiana First Circuit Court of Appeal's *Hebert v. Breaux* decision, which reformed an insurance policy that was originally issued to a father to provide coverage for the father's son after the father donated a car to his son and called his insurance agent to change the policy to provide coverage to the donated car and the son.[133]  Alternatively, Plaintiffs contend that, at a minimum, a genuine issue of material fact exists as to the intentions of the parties because Alford testified that Decedent was "involved in the insurance purchasing process," and as an intelligent man, would not have wanted to operate a vehicle that did not provide coverage to him *for his use of said vehicle*.[134]

In response, Defendants reiterate their prior arguments and further distinguish Plaintiff's authority, *Smith* and *Hebert*.  Defendants argue that, unlike *Smith*, there is a named insured in this case who is an actual person (Patsy); unlike *Hebert*, Plaintiffs have offered no evidence that any person specifically requested for Defendants to name Decedent as an insured on the Infiniti Policy.[135]

---

[131] R. Doc. 18, p. 8 and R. Doc. 17-2, p. 8, *citing* R. Doc. 13-16, p. 18.
[132] R. Doc. 18, p. 8 and R. Doc. 17-2, pp. 8-9, *citing Smith v. Matthews,* 611 So.2d 1377, 1379-80 (La. Jan. 19, 1993). In *Smith*, the named insured was a non-entity which, if determined to be the only insured, would have meant there was no insured under the policy.  The *Smith* court considered this an "untenable" result and thus reformed the policy based on the parties' intent for the heir to be the insured.  *Id.*
[133] *Hebert v. Breaux,* 285 So.2d 829, 831 (La. App. 1 Cir. Nov. 12, 1973).
[134] R. Doc. 18, pp. 9-10.
[135] R. Doc. 21, p. 14.

"An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code."[136] "The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent."[137] "The parties' intent as reflected by the words in the policy determine the extent of coverage."[138] Regarding the applicable standard for reformation, the Louisiana Supreme Court has succinctly held:

> 'As other written agreements, insurance policies may be reformed if, through mutual error or fraud, the policy as issued does not express the agreement of the parties.' … 'In the absence of fraud, the party seeking reformation has the burden of proving a mutual error in the written policy." *Id.* 'Parole evidence is admissible to show mutual error even though the express terms of the policy are not ambiguous.' … In *Ferguson v. Belcher and Son,* 230 La. 422, 88 So.2d 806 (1956), this Court indicated that 'the burden is on the one seeking the reformation to prove the error, and he must carry said burden by clear, and the strongest possible proof.' … This requirement was modified in *Bonadona v. Guccione,* 362 So.2d 740 (La. 1978), which held that the clear and convincing evidence of mutual mistake was necessary only when a party sought to prove that the insurer had insured a substantially different and greater risk than that expressed by the written policy. *Id.* On the other hand, only the normal burden of proof by a preponderance of the evidence was required to reform a policy in a manner which did not substantially affect the risk assumed by the insurer.[139]

The parties agree that the Infiniti Policy prepared on July 27, 2017 is the operative one.[140]

As the party seeking reformation of the Infiniti Policy, Plaintiffs bear the burden of proving that

---

[136] *Samuels,* 939 So.2d at 1240, *citing Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.,* 630 So.2d 759, 763 (La. Jan. 14, 1994) (*citing Smith,* 611 So.2d at 1379; *Central Louisiana Elec. Co., Inc. v. Westinghouse Elec. Corp.,* 579 So.2d 981, 985 (La. May 6, 1991)).

[137] *Samuels,* 939 So.2d at 1240, *citing Louisiana Ins. Guar. Ass'n,* 630 So.2d at 763 (*citing* La. C.C. art. 2045 (defining contractual interpretation as "the determination of the common intent of the parties")).

[138] *Samuels,* 939 So.2d at 1240, *citing Id.* (*citing Trinity Industries, Inc. v. Insurance Co. of North America,* 916 F.2d 267, 269 (5th Cir. 1990) (*citing Pareti v. Sentry Indem. Co.,* 536 So.2d 417 (La. Dec. 12, 1988))).

[139] *Samuels,* 939 So.2d at 1240 (citations omitted). *See also American Electric,* 556 F.3d at 287, n. 4.

[140] R. Doc. 13, p. 2; R. Doc. 13-1, p. 3; R. Doc. 13-2, p. 3, ¶ 21; R. Doc. 13-5, ¶ 3; R. Doc. 13-7, p. 2 and R. Doc. 17, p. 2; R. Doc. 17-2, p. 8; R. Doc. 17-6, p. 2; and R. Doc. 18-1, p. 2, ¶ 21.  The Infiniti Policy declarations page indicates a date prepared of July 27, 2017 with a policy period of June 23, 2017 through December 6, 2017 *but see* the Certified Policy Record, which states: "The policy was in effect on the loss date of June 30, 2018," *and see* the footnote above regarding Defendants' issuance of new declarations pages.

there was a mutual mistake or error of the parties in drafting the terms of the Infiniti Policy.[141]

Defendants contend that Plaintiffs' burden is the higher "clear and convincing standard," which

Plaintiffs do not address.  The Infiniti Policy, as written, does not name Decedent as an insured

but Plaintiffs seek reformation of this policy to have Decedent named as an additional insured, the

result of which would be an extension of UM coverage of $500,000 for bodily injury sustained by

Decedent  in the Accident. Because it is undisputed that Decedent was not an insured under the

Infiniti Policy, in asking for reformation Plaintiffs seek "to prove that the insurer had insured a

substantially different and greater risk than that expressed by the written policy," which implicates

the higher burden of proof.[142]  "[I]n ruling on a motion for summary judgment, the judge must

view the evidence presented through the prism of the substantive evidentiary burden."[143]  "[T]here

is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or

quantity" to meet the clear and convincing standard.[144]

    The uncontroverted evidence of record is that Alford and Stewart testified that no one

involved with the family business ever requested for Decedent to be named as an insured under

the Infiniti Policy, nor did Decedent make that request, despite that he was aware of the fact that

he was not a named insured.[145]  Alford handled insurance matters for the business (in which

---

[141] Plaintiffs did not explicitly plead mutual mistake, error, or fraud as having vitiated the Infiniti Policy in the Petition. Plaintiffs did plead, however, that the Infiniti Policy contained "mistakes" and should have named Decedent as an insured, and also pled that Defendants failed to reform the policy. R. Doc. 1-3, ¶¶ 14-15.

[142] *See, e.g., American Electric*, noting that the higher standard likely applied there because the party seeking reformation desired the policy to cover an additional insured, *i.e.*, its subsidiaries comprised of limited liability companies, instead of just to corporations as expressly covered by the terms of the policy.  However, the *American Electric* court noted that the parties seeking reformation could not sustain their burden under either standard.  *Id. See also Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 748 (5th Cir. 2011) ("The burden is on the one seeking reformation to prove the error alleged by clear and convincing evidence"), *citing First State Bank & Trust Co. of East Baton Rouge Parish,* 501 So.2d at 285.

[143] *Anderson*, 477 U.S. at 254.

[144] *Id.*

[145] R. Doc. 13-16, pp. 14-16 (Alford testimony) and R. Doc. 13-12, pp. 33-34, 36 (Stewart testimony that individuals such as Decedent, who were listed as drivers under the Infiniti Policy were not insureds.  The additional drivers are listed related to "a rating issue with underwriting"); that Decedent was not listed as an insured under the Policy; that Decedent was aware that Patsy was the named insured under the Infiniti Policy and discussed it with Stewart in

decisions, Decedent also participated),[146] and Alford testified that she was aware that her mother was the named insured; that Alford and the family business knew that the Infiniti Policy was written to Patsy as the owner of Prime with the *insurable interest*; that Alford had no issue with the way the Infiniti Policy was written because Patsy owned the Infiniti; and that Alford was unaware of anyone with Prime who requested for Defendants to change the named insured on the Infiniti Policy to Decedent:[147]

> Q:   At any time, did Prime Properties or anyone else, to your knowledge, request that State Farm change the policy insuring the Infiniti to show Buddy as the named insured on the Policy?
>
> A:  No.[148]

Plaintiffs have come forward with no evidence to show that the issuance of the Policy naming Patsy as insured, and not Decedent, was the result of a mistake.  At most, Plaintiffs point to Alford's testimony that Decedent was intended to be covered under the Infiniti Policy as a "driver,"[149] and that Defendants knew or should have known that Decedent was intended to be an insured under the Infiniti Policy because Defendants knew Decedent was covered as a driver and/or because Defendants knew that Decedent drove the vehicle and used it for personal reasons, but this information would not permit a reasonable juror to conclude that there was clear and convincing evidence of a mutual mistake.  First, Alford did not testify that Decedent was intended to be named as an "insured."  In response to a question as to whether the Infiniti Policy was

---

connection with providing proof of insurance of the Infiniti to the City Council, as Decedent wanted to confirm that it was acceptable for Patsy to be listed as the insured when Prime owned the Infiniti; and that neither Decedent nor anyone else requested that Decedent be named as an insured on the Infiniti Policy).

[146] R. Doc. 13-16, pp. 7, 12-14 and R. Doc. 13-12, pp. 7-8.

[147] R. Doc. 13-16, pp. 14-16. Patsy testified that she agreed with all of Alford's testimony, and she personally did not know if the Infiniti Policy was intended "to cover" Decedent.  R. Doc. 13-15, p. 7.

[148] R. Doc. 13-16, p. 16.

[149] R. Doc. 13-16, p. 18. No party briefed the distinction between "driver" and "insured;" however, for practical purposes and according to Stewart, the list of drivers associated with a policy is used to rate the policy premiums.  R. Doc. 13-12, pp. 32-33.   Listed drivers are not insureds under the policy. R. Doc. 13-12, pp. 33-34.

intended to cover Decedent, Alford testified that the Infiniti Policy was "intended to cover the owner of the Infiniti who had the insurable interest which is my mother, and every driver as well, you know, drivers, as a driver."[150]  Decedent *was* listed as a driver.[151]  Further, under the plain terms of the Infiniti Policy language, Decedent would have been an insured for UM coverage while *occupying the Infiniti*,[152] which eliminates Plaintiffs' argument that a genuine issue a material fact exists as to the intent of the parties because Decedent was an intelligent man who would not have wanted to *operate a vehicle* that did not provide coverage to him.[153] No evidence has been presented that Prime, Patsy, Alford, or Decedent ever requested or clearly intended that Decedent be named as an *insured* on the Infiniti Policy, which distinguishes this case from *Smith*[154] and *Hebert*.[155]

Accordingly, Defendants' Motion will be granted to the extent it seeks dismissal of any claim by Plaintiffs for UM coverage under the Infiniti Policy for the Accident, as Decedent was not an insured under the policy, the policy did not provide UM coverage to Decedent based on the circumstances of the Accident, and there is no evidence of a mutual mistake so as to warrant

---

[150] R. Doc. 13-16, p. 18.

[151] R. Doc. 13-12, pp. 23-24 (Stewart testimony).

[152] "**Insured** means: … 3. Any other **person** while **occupying** … a. **your car** [Patsy's car, *i.e.*, the Infiniti] …." (emphasis in original). R. Doc. 13-7, pp. 27-28. Defendants also acknowledge that, if Decedent had been occupying the Infiniti at the time of the Accident, Plaintiffs likely would be entitled to recover UM coverage pursuant to this policy. R. Doc. 21, p. 14.

[153] R. Doc. 18, pp. 9-10 (emphasis supplied).

[154] In *Smith*, the agent knew the original insured was deceased, "that his estate was not the proper named insured and that someone other than the designated 'named insured' was to be the covered person." Additionally, the *Smith* court found that the designation of the heir, rather than the non-entity estate, "apparently would have made no difference to [the insurer] as to premiums or policy terms and conditions," *Smith*, 611 So. 2d at 1379, because otherwise there was no actual named insured.  The circumstances of *Smith* are not present here as there is a named insured on the Infiniti Policy, who is an actual person (Patsy).

[155] In *Hebert*, the father testified that he requested his son be an insured because, due to his son's age, the father did not want to bear responsibility for his son's potential liability. Additionally, the risk was rated throughout the life of the policy to indicate that a male driver under the age of 25 was covered under the policy and the father did not have any other children or relatives living in the house.  The insurance underwriter testified that she had no personal knowledge of the case and no independent recollection of a call from the father, *i.e.*, she could not dispute his account. Based on this information, the *Hebert* court found that the insurance company was bound by the knowledge of its agent as to the true intention of the parties, and the policy should have covered the son and his car per the parties' intent.  *Hebert*, 285 So.2d at 830-31.

reformation. Plaintiffs' Cross Motion will be denied to the extent it seeks a judgment for UM coverage under the Infiniti Policy.

   **E.   There is No Genuine Issue of Material Fact That the CLUP Does Not Provide UM Coverage and Decedent Was Not an "Insured" Under the Liability Coverage Such that Statutory UM Coverage Also Does Not Apply**

   The fifth and final policy at issue is Policy No. 98-55-0212-5, the CLUP issued to Patsy, Prime, and the Amoroso Family Limited Partnership by SFF.[156]  Defendants contend that, since original application in 1993,[157] UM coverage has been consistently rejected and waived by the applicants, as testified by Stewart,[158] and that the CLUP liability limits never changed from the CLUP's initial issuance until the Accident.  According to Defendants, the CLUP was intended to cover liability arising from the commercial management of rental properties owned by the family businesses.  Defendants point out that CLUP exclusion 6(b) excludes UM coverage;[159] the CLUP does not list any vehicles; the CLUP does not indicate any UM coverage on the declarations page; the CLUP does not show UM premiums; and, there are no UM terms or conditions in the CLUP policy packet.[160]  Defendants argue that Alford also testified that the CLUP was never intended to cover employees of Prime for activities unrelated to the business.[161]  Thus, Defendants argue: "there simply was no intention to obtain UM coverage under the CLUP, or for such coverage to

---

[156] R. Doc. 13-8, pp. 1-2 (Snyder affidavit); R. Doc. 13-11.

[157] R. Doc. 13-1, p. 21, *citing* Snyder affidavit at R. Doc. 13-8, pp. 1-2, attaching CLUP applications and renewals dated July 8, 1992 through October 27, 1999 for CLUP policies in effect from 1993 through 2000 at R. Doc. 13-11, pp. 32-47.  *See also* Stewart testimony at R. Doc. 13-12, pp. 28-29.  Stewart testified that Defendants no longer required renewal applications after 2000 but the CLUP continued in force through the date of the Accident.  R. Doc. 13-12, pp. 29-30.

[158] R. Doc. 13-1, p. 21, *citing* R. Doc. 13-12, pp. 29-30 (Stewart testimony that there are two places to indicate exclusion of UM coverage on the CLUP application, on the upper part of the form with a check box and a UM rejection signature line, and the applicants consistently rejected UM coverage).

[159] R. Doc. 13-1, p. 22, *citing* R. Doc. 13-11, pp. 16-17: "Business Liability Exclusions. This insurance does not apply to….6. Auto Coverages…b. Any loss, cost, or expense payable under or resulting from any…uninsured or under-insured motorist law."

[160] R. Doc. 13-1, p. 21, *citing* R. Doc. 13-11, pp. 32-47.

[161] R. Doc. 21, p. 21, *citing* R. Doc. 13-16, p. 17 (Alford deposition testimony) (Q: "Just to clarify, did Prime Properties ever intend that its commercial insurance with State Farm cover employees for anything that they were doing away from the business and unconnected to the business?" A: "No.")

apply to an employee of the family business while not using a vehicle and not on company business."[162]

Alternatively, Defendants argue that, even if the Court applies Louisiana's mandatory UM laws to the CLUP, summary judgment is still proper because: (1) the CLUP does not provide any provisions regarding UM coverage,[163] and (2) Decedent fails to qualify as an insured for any statutorily-mandated UM coverage because he does not qualify as a liability insured.[164] This is because Decedent was not conducting any activity related to his employment with the family business at the time of the Accident or using a "covered auto," nor was he an insured for liability purposes under the underlying Infiniti Policy.

Plaintiffs respond that there is no valid UM rejection form for the CLUP, as the 1993 rejection form does not comply with Louisiana law. Plaintiffs also argue that the CLUP provides UM coverage because Decedent was a named insured who operated a covered auto (the Infiniti) and because the Infiniti Policy also qualifies as underlying insurance.

The parties agree that the CLUP prepared on December 19, 2017 is the operative one.[165] Louisiana's UM statute applies to commercial umbrella liability policies.[166] A two-step analysis

---

[162] R. Doc. 21, p. 21.

[163] *See Green v. ex rel. Peterson v. Johnson,* 2014-0292 (La. 10/15/14), 149 So.3d 766 ("Thus, the *Magnon* holding [*see* below], because it discussed statutorily-mandated UM coverage, is not examined at the outset when the automobile insurance policy at issue contains express contractual UM coverage, absent some contention that the contractual coverage runs afoul of the UM statute.")

[164] R. Doc. 13-1, p. 23. Defendants rely on *Magnon v. Collins,* 98-2822 (La. 7/7/1999), 739 So.2d 191, 193, (and two subsequent Louisiana Supreme Court decisions, *Succession of Fannaly v. Lafayette Insurance Company*, 01–1355 (La. 1/15/02), 805 So.2d 1134, and *Carrier v. Reliance Insurance Company*, 99–2573 (La. 4/11/00), 759 So.2d 37). In *Magnon*, the Louisiana Supreme Court considered the requirements of the UM statute to determine whether the tort victim was entitled to statutory UM coverage under his employer's commercial general liability policy ("CGL") in the absence of express contractual coverage, and recognized that "it is well-settled that a person who does not quality as a liability insured under a policy of insurance is not entitled to UM coverage under the policy….In other words, a plaintiff must be an 'insured' under auto liability coverage to be entitled to UM coverage."

[165] R. Doc. 13, p. 2; R. Doc. 13-1, p. 3; R. Doc. 13-2, p. 4, ¶ 34; R. Doc. 13-8, pp. 1-2, ¶ 3; R. Doc. 13-11, p. 2 and R. Doc. 17, p. 2; R. Doc. 17-3, p. 2; and R. Doc. 18-1, p. 3, ¶ 34. The CLUP declarations page indicates a policy period of January 8, 2018 through January 8, 2019, *and see* the Certified Policy Record, which states: "The policy was in effect on the loss date of 6/30/2018."

[166] *Southern American Ins. Co.*, 441 So.2d at 1190 (on rehearing).

is used to determine the existence of UM coverage under a policy:  1) the policy language is examined to determine whether UM coverage is contractually provided under the express provisions of the policy; 2) if no UM coverage is provided under the policy provisions, the UM statute is applied to determine whether statutory coverage is mandated.[167]

The CLUP does not explicitly provide for UM coverage by its own terms, and as Defendants point out, expressly excludes UM coverage.[168]   Further, the 1993 CLUP application and most of the renewals indicate that the applicant rejected UM coverage on Defendants' forms by marking a check-box and signing on the UM rejection signature line.[169]   Nevertheless, Louisiana law is clear that, after amendments set forth in 1997 La. Acts. No. 1476, § 3 and 1999 La. Acts. No. § 732, § 1 to the UM statute,[170] UM coverage could only be properly rejected on the form promulgated by the Commissioner of Insurance.  It is undisputed that there are no properly executed CLUP UM Selection Forms in the record. "UM coverage will be read into the policy unless validly rejected," as the requirement of UM coverage is an implied amendment of any automobile liability policy, even one that does not expressly address the subject matter.[171]  Thus, Defendants' argument that there is no UM coverage, simply because the CLUP was not intended to provide for it and/or does not expressly provide for it, fails.  However, that is not the end of the inquiry.  We must next look to the application of the UM statute.

Plaintiffs' argument that, since Decedent was a named insured under the CLUP, he is automatically entitled to UM coverage, is also incorrect.  In *Magnon v. Collins*, the Louisiana Supreme Court recognized that, "Although Louisiana's public policy strongly favors UM coverage

---

[167] *Green ex rel. Peterson v. Johnson*, 2014-0292 (La. 10/15/14), 149 So.3d 766, 774 (citations omitted).
[168] R. Doc. 13-11, p. 17.
[169] R. Doc. 13-11, pp. 32-46.  In at least three of the renewal CLUP applications in the record, either the check box is not marked, or the UM rejection signature line is not signed.
[170] 1997 La. Acts. No. 1476, § 3, effective September 6, 1998 and 1999 La. Acts. No. § 732, § 1.  *See also Duncan,* 950 So.2d at 548-49.
[171] *Magnon*, 739 So.2d at 195-96 (citations omitted).

and a liberal construction of the UM statute, it is well settled that a person who does not qualify as

a liability insured under a policy of insurance is not entitled to UM coverage under the policy….In

other words, a plaintiff must be an 'insured' under *auto liability coverage* to be entitled to UM

coverage."[172]   Thus, the relevant provisions of the CLUP must be examined to determine if

Decedent qualified as an insured for auto liability coverage under the CLUP.

> The relevant CLUP provisions are as follows:
>
> Throughout this policy the words "you" and "your" refer to the Named
> Insured shown in the Declarations, and any other person or organization
> qualifying as a Named Insured under this policy.
>
> ***
>
> **Coverage L - Business Liability**
>
> > 1. We will pay on behalf of the insured the "ultimate net loss" in
> >    excess of the "retained limit" because of "bodily injury",
> >    "property damage" or "person and advertising injury" to which
> >    this insurance applies.
> >
> >                    …
> >
> > 5. Damages because of "bodily injury" include damages claimed
> >    by any person or organization for care, loss of services or death
> >    resulting at any time from the "bodily injury."[173]
>
> ***
>
> **Business Liability Exclusions**
>
> This insurance does not apply to:
>
>                    …

---

[172] *Id.* at 196 (string cite omitted) (emphasis added).  The *Green* court concluded that the *Magnon* holding "was intended to convey only that, in order for a tort victim to be entitled to statutory UM coverage, which would be an implied amendment to an automobile liability policy not expressly containing such coverage, the tort victim seeking UM coverage must qualify as a liability insured under the policy at issue." *Green*, 149 So.3d at 772 (emphasis in original). The *Green* court also noted the extension of *Magnon*'s holding to CGI policies, citing *Succession of Fannaly* and *Carrier. Id.* at 772-73.

[173] R. Doc. 13-11, p. 15.

      **6.**      **Auto Coverages**

      a.    "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any "auto" which is not a "covered auto." … or

      b.    Any loss, cost or expense payable under or resulting from any first party physical damage coverage; no-fault law; personal injury protection or auto medical payments coverage; or uninsured or underinsured motorist law.[174]

***

## WHO IS AN INSURED

1.  Except for liability arising out of ownership, maintenance, or use of "covered autos":

    a.  If you are designated in the Declaration as:

      (1) An individual, you and your spouse are insureds, but only with respect to the conduct of business, other than described in (2) and (5) below, of which you are the sole owner.

      (2) A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insured, but only with respect to the conduct of your business.

      (3) A limited liability company, you are an insured. Your "members" are also insured, but only with respect to the conduct of your business.  Your "managers" are insured, but only with respect to their duties as "managers".[175]

    …

2.  Only with respect to liability arising out of ownership, maintenance, or use of "covered autos".

    a.  You are an insured.

    …

3.  Any other person or organization who is insured under any policy of "underlying insurance" will automatically be insured under this insurance.

    …

The coverage provided by this insurance for such insureds:

    a.  Will not be broader than coverage provided by the "underlying insurance"; and

---

[174] R. Doc. 13-11, p. 17.
[175] R. Doc. 13-11, p. 23.  The terms "members" and "managers" are defined at p. 29.

       b.  Is subject to all the coverage limitations found in the "underlying insurance" other than the Limits of Insurance.[176]

\*\*\*

"Covered auto" mean only those "autos" to which "underlying insurance" applies.[177]

\*\*\*

"Underlying insurance" means any insurance listed in the Declarations under Required Underlying Insurance.[178]

The CLUP lists the "Named Insured" as Patricia H. Amoroso, Amoroso Family Limited Partnership, and Prime Properties, LLC.[179] Decedent is listed under the provision "NAMED INSUREDS FULL NAMES."[180]

       The CLUP's Business Liability Exclusion excludes auto liability coverage for "any 'auto,' which is not a 'covered auto;'" therefore, the CLUP's Business Liability coverage applies to "covered autos."[181] "Covered autos" are defined as "only those 'autos' to which 'underlying insurance' applies."[182] While it is not clear from the CLUP declarations page, which does not identify the name or policy numbers of the underlying insurance policies,[183] the parties agree that the applicable "underlying insurance" as referred to in the definition of "covered auto" is the

---

[176] R. Doc. 13-11, p. 24.
[177] R. Doc. 13-11, p. 28.
[178] R. Doc. 13-11, p. 31.
[179] R. Doc. 13-11, p. 2.
[180] R. Doc. 13-11, p. 5.
[181] R. Doc. 13-11, p. 17.
[182] R. Doc. 13-11, pp. 28, 31.
[183] R. Doc. 13-11, pp. 2-3, which refers generally to "Automobile Liability (Other than Buses and Passenger Vans)," although the limits of this liability is the same as provided for in the Infiniti Policy, *i.e.*, Bodily Injury (Each Person/Each Accident) of $500,000/$500,000.  *Compare* R. Doc. 13-7, p. 2.  It is unclear to what policies the remaining coverages relate.

Infiniti Policy,[184] which applies to the Infiniti driven by Decedent.[185] The question is whether Decedent qualifies as an "insured," for "any determination of whether a plaintiff is entitled to UM benefits must follow a determination that the plaintiff is an insured for purposes of auto liability insurance coverages."[186]

Defendants argue (with no opposition from Plaintiffs), that the first definition of WHO IS AN INSURED applies to persons denoted as "insureds" on the declarations page (such as Decedent), "only with respect to the conduct of your business," but who are not engaged in the use of a covered auto.  There is no dispute that Decedent was not engaged in any business activities during the Accident, which occurred while Decedent was riding his bicycle as a personal hobby, and therefore, this first definition does not apply.

In contrast, the second definition does not reference the conducting of any business, but rather states: "only with respect to liability arising out of the ownership, maintenance, or use of 'covered autos,' a. You are an insured."[187]  Decedent is listed on the declarations page, such that he falls within the definition of "You;" however, liability in this case does not arise out of ownership, maintenance or use of a "covered auto."  The parties agree the "covered auto" for purposes of this analysis would be the Infiniti.[188] There is no genuine issue of material fact that Decedent was riding his "Trek Domanc 5.2 bicycle" at the time of the Accident, which is not a "covered auto," nor is it even an "auto," which the CLUP defines as being "a land **motor vehicle**, trailer or semitrailer designed for travel on public roads, including attached machinery or

---

[184] "Plaintiffs submit that, without question, the [Infiniti] Policy qualifies as the required underlying insurance."  R. Doc. 18, p. 15, and further, Plaintiffs concede that the Business Owner's Policy does not provide UM coverage for the Accident in this matter.  R. Doc. 18, pp. 1, 3, 17.
[185] R. Doc. 13-7, p. 2 defining "Your Car" as the Infiniti, and p. 18, providing liability coverage for the use of "your car."
[186] *Magnon*, 739 So.2d at 196.
[187] R. Doc. 13-11, p. 24.
[188] R. Doc. 13-11, pp. 28, 31.

equipment."[189]  Thus, Decedent is also not an insured for purposes of the second definition as the Accident occurred while Decedent was riding his bicycle, not using the Infiniti.[190]

Finally, the third definition is a catch-all that provides: "Any other person or organization who is an insured under any policy of 'underlying insurance' will automatically be an insured under this insurance…subject to all the coverage limitations found in the 'underlying insurance' other than the Limits of Insurance."[191]  Plaintiffs contend that the operative policy of underlying insurance is "without question" the Infiniti Policy,[192] which should be reformed to include Decedent as an "insured," which would then result in Decedent being an insured under the CLUP. That argument has already been rejected for the reasons explained above, as Plaintiffs have not come forward with sufficient evidence of a mistake or a mutual error to support reformation of the Infiniti Policy.  As that is the only policy of underlying insurance that Plaintiffs argue meets the terms of the third definition, Decedent is also not an insured under that provision.[193]

Accordingly, Defendants' Motion will be granted to the extent it seeks dismissal of any claim by Plaintiffs for UM coverage under the CLUP for the Accident, as Decedent was not an

---

[189] R. Doc. 1-3, ¶ 3; R. Doc. 17-15; R. Doc. 13-13, pp. 39-40; and R. Doc. 13-11, p. 28 (emphasis added). Louisiana's Motor Vehicle Laws reflect that bicycles are considered "vehicles," but there is authority holding that they are not "motor vehicles." La. R.S. § 32:1(92) "'Vehicle' means every device by which persons or things may be transported upon a public highway or bridge, except devices moved by human power or used exclusively upon stationary rails or tracks. A bicycle or a ridden animal shall be a vehicle, and a trailer or semitrailer shall be a separate vehicle." *But see Foster v. Kinchen,* 2016-0544 (La. App. 1 Cir. 3/29/17), 217 So.3d 437, 441 (noting that, while a bicycle is a "vehicle," "[t]he definition of a motor vehicle in LSA–R.S. 32:1(40) encompasses self and electric propelled vehicles. Notably, a bicycle is not included in the definition of a 'motor vehicle.' In fact, a 'motorized bicycle,' which is presumably self or electric propelled, is specifically excluded from the definition of a 'motor vehicle.'").

[190] Defendants point out, and the Court agrees, that the opposite outcome would result had Decedent been using the Infiniti at the time of the Accident. R. Doc. 21, p. 8, n. 6.

[191] R. Doc. 13-11, p. 24.

[192] R. Doc. 18, p. 15.

[193] This analysis is consistent with the Louisiana Supreme Court's recent decision in *Higgins v. Louisiana Farm Bureau Cas. Co.,* 2020-1094 (La. 3/24/21), -- So.3d --, 2021 WL 1115393, which distinguished a situation "where a plaintiff who plainly hold the status of an *insured person* under a personal automobile policy that *expressly provides UM coverage* seeks to enforce that UM coverage," from cases which held that employees did not qualify as insureds under their employers' CGL insurance policies. *Id.* at *7 (emphasis in original).  The *Higgins* court specifically noted that its decision did not conflict with the cases upon which Defendants rely (n. 164, *supra*), *Succession of Fannaly* and *Carrier*. *Id.* at **7-8.

insured for purposes of auto liability coverage under the CLUP such that he is also not an insured for purposes of UM coverage.  Plaintiffs' Cross Motion will be denied to the extent it seeks a judgment for UM coverage under the CLUP.

### III.    Conclusion

While the untimely death of former Baton Rouge Metro Councilman "Buddy" Amoroso is tragic, the disputed insurance policies at issue in this case do not afford UM coverage for the Accident in this matter, which arose while Decedent was riding his bicycle. That is true because Decedent: rejected UM coverage altogether (PLUP); selected lower UM limits which have already been paid (Personal Auto Policy); is not a named insured on a policy where there is no evidence of mutual mistake that would warrant reformation (Infiniti Policy); and does not qualify as an insured for liability coverage (CLUP).  Accordingly,

**IT IS ORDERED** that the Motion for Summary Judgment,[194] filed by Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company, is **GRANTED**.  All of Plaintiffs' claims in this matter are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment on Issue of UM Coverage,[195] filed by Plaintiffs Denise Amoroso, Michal Ann Amoroso, Elaine Amoroso Stewart, and Anthony Amoroso, V is **DENIED** in light of the granting of Defendants' Motion for Summary Judgment.

A separate Judgment will be entered accordingly.

Signed in Baton Rouge, Louisiana, on March 26, 2021.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[194] R. Doc. 13.
[195] R. Doc. 17.